UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

KATHY ANN HEWITT,

                        Plaintiff,                    Civil Action No.: 13-13082
                                                      Honorable Robert H. Cleland
            v.                                        Magistrate Judge David R. Grand

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                        Defendant.
_____/


## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [11, 17]

Plaintiff Kathy Ann Hewitt brings this action pursuant to 42 U.S.C. § 405(g),[1]

challenging a final decision of Defendant Commissioner of Social Security ("Commissioner")

denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security

Income ("SSI") under the Social Security Act (the "Act").  Both parties have filed summary

judgment motions which have been referred to this Court for a Report and Recommendation

pursuant to 28 U.S.C. § 636(b)(1)(B).

---

[1] On October 3, 2013, Hewitt's counsel, in a motion to extend the briefing schedule, informed the Court of Hewitt's death.  [10].  However, counsel never sought to substitute a party of interest for the now-deceased Hewitt, and upon contact with counsel, the Court was informed that she has been attempting, to no avail, to make contact with the deceased's next of kin.  While this action could potentially be dismissed due to the failure to timely substitute a proper party, since the Court finds that Hewitt's appeal of her claim fails on its merits, it provides that analysis here.  *See* Fed. R. Civ. P. 25(a)(1) ("If a party dies and the claim is not extinguished, the court may order substitution of the proper party.  A motion for substitution may be made by any party or by the decedent's successor or representative.  If the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed.").

## I.   RECOMMENDATION

For the reasons set forth below, the Court finds that the Administrative Law Judge's ("ALJ") decision is supported by substantial evidence of record and should be affirmed. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [17] be GRANTED, Hewitt's motion [11] be DENIED and that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be AFFIRMED.

## II.   REPORT

### A.   Procedural History

On September 16, 2010, Hewitt filed applications for both DIB and SSI alleging disability as of August 8, 2010.  (Tr. 150-60).  The claims were denied initially on March 3, 2011.  (Tr. 99-106).  Thereafter, Hewitt filed a timely request for an administrative hearing, which was held on January 23, 2012, before ALJ Tammy Thames.  (Tr. 31-68).  Hewitt, represented by attorney John Morosi, testified, as did vocational expert ("VE") Donald Hecker. On May 10, 2012, the ALJ found Hewitt not disabled.  (Tr. 9-30).  On June 28, 2013, the Appeals Council denied review.  (Tr. 1-6).  Hewitt filed for judicial review of the final decision on July 18, 2013.  [1].

### B.   Framework for Disability Determinations

Under the Act, DIB and SSI are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

2

The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21 (E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

**C.   Background**

*1.    Plaintiff's Testimony and Subjective Reports*

At the time of her hearing, Hewitt was 47 years old, and had completed the ninth grade. (Tr. 36).  She reported suffering from the following conditions: a mini stroke, with a blood spot on the brain, bulging disks in her neck and back, migraine headaches, panic and anxiety attacks,

3

and depression. (Tr. 193). She reported that she originally stopped working as a housekeeper at an apartment complex on August 8, 2010, when she suffered a mini stroke. (Tr. 37-38; 40; 46-47; 199). Her doctor imposed restrictions and then ultimately took her off work. (*Id.*). She attempted to return to work on August 26 and 27 but had to stop again due to doctor's orders and poor health. (*Id.*). Hewitt reported that both her headaches, and some of the medication she takes to treat them, cause her to be nauseated and sometimes vomit. (Tr. 53; 229). She also testified, however, that she was on Vicodin while working, and that it did not make her sleepy and she "could tolerate it" and do her job. (Tr. 45-46). She testified to having headaches almost every day, and that she is nauseated between 10-15 days a month. (Tr. 61). She reported taking a number of different medications for her headaches. (Tr. 40-44; 195). The variety of medications has been due, in part, to their varying success and failure, and also due to her inability to obtain many of them with her insurance. (Tr. 40-44). Thus, her doctor frequently gave her samples. (*Id.*).

Hewitt testified to being anxious about her financial situation and this case, and having panic attacks that can come on at any time. (Tr. 51-52). She does not like to be around people generally, but is okay with people she knows well. (Tr. 55-56). She testified that she was able to work as a waitress at a bar because it was a "family bar" patronized mostly by people she knew. (Tr. 56). Hewitt testified that she had previously undergone injections and physical therapy for her back pain, but that neither helped, although she continues to perform exercises daily at home. (Tr. 50; 54; 59). She had also been recommended to have back surgery, but that her insurance presently will not cover it until she stops smoking, which she has been unsuccessful in doing. (Tr. 58-59). She takes Vicodin for back pain and Xanax and Celexa for panic and anxiety. (Tr. 51; 195).

Hewitt's day consists of taking her son to school when she feels well enough, then sitting or lying around all day, with intermittent walking breaks, and cooking a quick dinner meal. (Tr. 229-31). She watches television and reads, but has a hard time concentrating. (Tr. 233). Her son and daughter perform most of the household chores. (Tr. 230). Hewitt takes baths because she cannot stand long enough to take a shower. (Tr. 230). She can drive a car, go out alone, and shop twice a month for food, which takes her between 45 minutes and an hour. (Tr. 232). She does not go out socially. (Tr. 234). Hewitt reported being able to walk for 20 minutes and sit for about an hour at a time before needing to change position. (Tr. 53-54; 234-35). She can lift somewhere between a gallon of milk and a case of soda. (Tr. 55). She also reported difficulty with spoken instructions, getting along with others and changes in her routine. (Tr. 234-35). Her daughter filled out a third-party report, corroborating Hewitt's report. (Tr. 217-28).

Hewitt reported a worsening of her condition in January 2011, when she was admitted to the hospital with chest pain and was found to have a leaking heart valve. (Tr. 59; 243). Since having the heart catheter, she also reported that her right leg and foot have gone numb and cold. (*Id.*; Tr. 48-49). She also reported a change in medications, including aspirin for blood thinning, a thyroid medication and a cholesterol medication. (Tr. 246). She reported that the worsening of her physical conditions had increased her depression. (Tr. 247).

    2.    *Medical Evidence*

    a.    *Treating Sources*

    i.    *Headaches*

On August 8, 2010, Hewitt was admitted to the hospital complaining of headaches, and reported a long history of migraines. (Tr. 446). She reported waking up with headaches the past two years, and described the pain as throbbing, with occasional vomiting. (*Id.*). A CT scan

showed a small calcification versus a hemorrhage in her left caudate nucleus. (Tr. 293-94; 447). An MRI revealed a subtle area of abnormal signal in the same area "compatible with a small area of deoxyhemoglobin from a recent hemorrhage less than three days old." (Tr. 295). MRAs of the head, brain and neck were normal. (Tr. 296-97; 200). Hewitt was admitted to the hospital for observation. (Tr. 447). Dr. S. Sriharan, a neurosurgeon, was consulted and determined that a small 4mm hemorrhage was present, and he recommended a four-vessel angiogram, and an echocardiogram ("EKG"). (Tr. 350). The angiogram identified no abnormalities, while the EKG revealed mild-to-moderate mitral and tricuspid regurgitation. (Tr. 301-302; 359-60). A second neurosurgeon determined that, based on the foregoing test results, there was no need for a surgical procedure at this time. (Tr. 377). A repeat CT scan of her brain showed a dissipating hemorrhage, and a repeat MRI was normal. (Tr. 298; 300). She was discharged on August 11, 2010, with instructions to increase activity as tolerated. (Tr. 315-19). At the same time, the doctor wrote her an off-work slip for two weeks. (Tr. 489).

Hewitt underwent another head CT on August 25, 2010, which showed a resolving hemorrhage and no other new findings. (Tr. 292). She treated with Dr. Sriharan on August 30, 2010, again complaining of a bad headache. He recommended that if it gets worse, she should go to the emergency room. (Tr. 347-48). Hewitt did go to the emergency room on September 13, 2010, complaining of a headache. (Tr. 448). The pain was accompanied by nausea and vomiting, but no loss of power, numbness or tingling. (*Id.*). A head CT taken that day showed a possible calcified vascular malformation that appeared stable as compared to the CT scan of August 25, 2010, but no acute intracranial abnormality. (Tr. 283-85; 453). At a follow-up on November 3, 2010, Dr. Sriharan noted that Hewitt had suffered a bad headache lasting 11 days that was relieved by an injection. (Tr. 345). He reported that he was monitoring a "possible

6

little venous angioma in her head." (*Id.*). A November 13, 2010 CT scan of Hewitt's head showed a "stable hyperdensity in the left frontal periventricular white matter," which "likely represents a small venous malformation." (Tr. 533). A phone call to Dr. Vargas on January 7, 2011, who last treated Hewitt on December 7, 2010, found that he believed Hewitt's headaches were connected to carbon monoxide in her home. (Tr. 386).

However, when admitted to the hospital on January 4, 2011, for chest pains, Hewitt reported a headache, which was not relieved by Toradol, and the doctor gave her some Demerol to relieve it. (Tr. 390). She was in the emergency room three times for headaches between April and May 2011. (Tr. 633-39; 640-47; 649-60). On each occasion she complained of a headache that had lasted between several hours and several days, was accompanied by nausea and vomiting, and was not relieved by home medication. (*Id.*). On each occasion, Hewitt was given several medications and released. (*Id.*).

Hewitt was seen by Dr. Gregory Dardas for a neurological consult on June 21, 2011. (Tr. 535). She reported 2-3 headaches a month. (*Id.*). Upon exam he found that her cranial nerves were intact, her deep tendon reflexes were normal, her sensory exam was unremarkable and her motor strength was full. (Tr. 535-36). She had a normal station and gait. (Tr. 536). Dr. Dardas also noted that Hewitt's "[a]ttention and concentration were unremarkable." (*Id.*). He concluded that she had migraines that were not affected by her cervical disorder. (*Id.*). He offered her samples of a medication to try pending insurance approval, and recommended a reduction in caffeine as well as smoking cessation. (*Id.*). Hewitt returned to the emergency room again on July 13, 2011, with a headache that had lasted three days. (Tr. 662-69). She reported nausea and vomiting, and that her home medications made it worse. (Tr. 662). She was treated with medication and released. (*Id.*).

7

Hewitt returned to Dr. Dardas on July 26, 2011. (Tr. 542). Upon exam, her cranial nerves were intact, she had good coordination, reflexes and motor strength, and intact senses. (*Id.*). He modified her medications, recommended a cervical MRI to rule out a surgical problem and recommended a follow-up. (Tr. 542-43). At an August 30, 2011 follow-up, Dr. Dardas noted no new findings on exam, concluded that her cervical disk herniation was not a surgical problem, and adjusted her medications and ordered physical therapy. (Tr. 548-49). Hewitt completed a round of physical therapy on October 21, 2011 and was discharged due to a lack of progress, pending a follow-up with Dr. Dardas. (Tr. 676-77). Hewitt followed up with Dr. Dardas on October 25, 2011, reporting approximately 15 migraines a month and that she was feeling tired from her medications. (Tr. 550). Her exam revealed no abnormalities, and the doctor managed her medications and referred her for am EMG for her cervical spine. (Tr. 550-51). He noted that she might be a surgical candidate, but that she was told she could have surgery only if she quit smoking for two weeks but so far has not been able to it. (Tr. 551). The following day, Hewitt phoned Dr. Dardas's office and asked if carbon monoxide poisoning could be causing her headaches. (Tr. 553).

After a second course of physical therapy, Hewitt returned to Dr. Dardas, noting that at-home physical therapy was helping her manage her neck pain quite well. (Tr. 670). She reported feeling mentally foggy on her Topamax. (*Id.*). Dr. Dardas noted that the headaches and neck pain seemed to be somewhat intertwined, and that she would have to continue to manage with physical therapy until she quit smoking, which she had so far been unable to do, because until then surgery was not an option. (Tr. 670-71). Dr. Dardas discontinued Hewitt's Topamax, and recommended follow-up on an as-needed basis. (Tr. 671).

8

ii.    *Back and Neck Pain*

At an exam on August 8, 2010, Hewitt was found to have a full range of motion of her neck. (Tr. 350; 446). She was also found to have good strength, sensation, and deep tendon reflexes in all extremities, and walked with a normal gait. (*Id.*). She denied any problems with exertion and walking, and denied problems with tingling or dizziness. (*Id.*). On August 30, 2010, Hewitt complained to Dr. Sriharan of neck and lower back pain, with radiation to left leg and foot, and numbness in her hands. (Tr. 347). He ordered MRIs of the cervical and lumbar spine. (*Id.*). An MRI of Hewitt's cervical spine revealed multilevel cervical spondylotic changes, disc bulging at C5-C6 and C6-C7, with "focal left paracentral disc protrusion resulting in mild spinal stenosis and significant bilateral neural foraminal narrowing" at C5-C6 and a "small right paracentral disc protrusion at C6-C7 without spinal stenosis or foraminal stenosis." (Tr. 287-88). It also found significant right neural foraminal narrowing at C3-C4 and mild to moderate right neural foraminal narrowing at C4-C5. (*Id.*). Hewitt returned to Dr. Sriharan on September 8, 2010, where he noted that her herniated disk at C5-C6 and C6-C7, caused "a little bit of indentation to the spinal cord." (Tr. 346; 564). He recommended conservative treatment, and prescribed physical therapy and epidural injections. (Tr. 346; 564). He wrote her a second off-work slip, stating that she was "currently disabled from all work for 8 weeks" with "permanent restrictions" of no lifting greater than 10 pounds, and no repetitive pushing, pulling, bending, or twisting. (Tr. 490; 564).

Hewitt presented to the emergency room on September 13, 2010, for headaches and shoulder pain. (Tr. 448). At that time she was found to have good muscle strength in all extremities, good grip strength, no numbness or tingling, good sensation and a steady gait. (Tr. 448). The doctor opined that Hewitt was suffering from "just minimal amount of shoulder pain."

9

(Tr. 449). She was seen in the pain clinic on September 15, 2010, complaining of back and neck pain. (Tr. 374-76). She reported that the pain started two years prior after an auto accident. (Tr. 374). It radiated from the neck to both shoulders, and from the lower back to the left thigh. (*Id.*). Activity and movement made the neck pain worse, but she denied any weakness. (*Id.*). An exam revealed full motor strength in all extremities, normal reflexes and a normal gait. (Tr. 375). She had "mild extension with movement of the cervical spine" and mild-to-moderate tenderness in her lumbar area. (*Id.*). After a review of her recent MRIs, she was diagnosed with chronic neck and back pain, cervical radiculopathy and facet arthritis. (*Id.*). The doctor scheduled her for injections. (*Id.*).

Hewitt completed a 12-session course of physical therapy for her cervical spine in September and October 2010. (Tr. 321-43). Hewitt sought discharge at this time, stating that her pain was much better and that she felt she could manage the residual pain independently. (Tr. 326). Upon discharge, Hewitt was noted to have an increased range of motion, increase in the amount of time she could sit comfortably, a decrease in the frequency and intensity of her headaches and less tightness in her neck. (Tr. 326-27). Her pain level was between 3-4/10 with a maximum pain level of 7/10. (Tr. 326). Upon exam, she remained tight, with positive trigger points. (*Id.*). On October 28, 2010, Hewitt underwent a cervical epidural injection as well as a trapezius trigger point injection. (Tr. 372-73).

On November 3, 2010, Hewitt returned to Dr. Sriharan. (Tr. 345; 565; 603). She reported that the therapy and shots gave her only temporary relief, and that she had just had an 11-day headache that was relieved by an injection. (Tr. 345). Dr. Sriharan recommended cervical fusion therapy, although he stated that this might not fully relieve Hewitt's headaches because they may be multifactorial. (*Id.*). He recommended continuing conservative treatment

10

for her lumbar spine. (*Id.*). Hewitt returned to Dr. Sriharan on November 24, 2010, prepared to go ahead with surgery, which he then ordered to be done on January 18, 2011, pending medical clearance. (Tr. 566; 604). It appears that surgery could not be completed, however, due to the fact that Hewitt could not stop smoking. (Tr. 536).

There is some record of Hewitt receiving physical therapy for her lumbar spine, although the majority of these records are illegible. (Tr. 604-611). It appears that Hewitt was recommended to continue therapy after the end of her original session on December 17, 2010. (Tr. 604). On that date, after eight sessions, it was found that she had only partially met some of her treatment goals, and did not meet the goal of being able to stand longer than 10-15 minutes without pain. (Tr. 606). It appears Hewitt continued therapy, because an emergency room treatment note for chest pains from January 2011 referred to her being in physical therapy at the time. (Tr. 386-87). However, there are no further therapy notes in the record. A phone call to Dr. Vargas on January 7, 2011, resulted in him issuing restrictions on heavy lifting due to Hewitt's neck and back issues. (Tr. 386).

Hewitt returned to the pain clinic on January 14, 2011. (Tr. 613). Her last injection had been November, 30, 2010, and she reported that her pain was better overall than before her injections, and was now at a 5/10 in her neck and 6/10 in her back. (*Id.*). She did not want any further injections, and opined that her pain was better due to her inactivity. (Tr. 613). An exam revealed tenderness to palpation in the cervical and lumbar areas, no radiation of pain to the hips or legs, and muscle strength of 5/5 in both upper and lower extremities. (*Id.*). She had a full range of motion in her neck and back although she had pain at the endpoints of extreme movements. (*Id.*). She was instructed to follow-up as needed if her pain increased. (Tr. 614).

At an emergency room visit on April 5, 2011, for an unrelated condition, Hewitt was

found to have good motor strength and sensation. (Tr. 620). Hewitt was seen by Dr. Gregory Dardas for a neurological consult for headaches on June 21, 2011. (Tr. 535). Upon exam he found that her deep tendon reflexes were normal, her sensory exam was unremarkable, and her motor strength was full. (Tr. 535-36). She had a normal station and gait. (Tr. 536). At other emergency room visits in April and July 2011, her motor strength was again found to be full and her senses intact. (Tr. 634; 641; 657; 662).

An August 1, 2011 cervical spine MRI revealed pronounced degenerative changes at C5-C6 where a left sided disk herniation was superimposed on diffuse posterior disk protrusion with bilateral uncovertebral spurring and a bulging disk. (Tr. 546-47). The herniation abutted "and perhaps minimally indent[ed] the ventral aspect of the cervical spinal cord without intrinsic cord signal abnormality." (*Id.*). Also noted was degenerative narrowing of the C5-C6 neural foramina and mild spinal canal stenosis. (*Id.*). There were less severe degenerative changes at C3-C4 and C6-C7 with mild degenerative narrowing of the neural foramina. (*Id.*). At an appointment with Dr. Dardas for her headaches on August 30, 2011, the doctor opined that he did not believe the disk herniation required surgery and recommended physical therapy. (Tr. 548-49).

Hewitt completed a round of physical therapy on October 21, 2011 and was discharged due to a lack of progress, pending a follow-up with Dr. Dardas. (Tr. 676-77). Her pain level on discharge was 6-7/10, and she complained that she was not getting any carryover of symptom relief from therapy to home. (Tr. 676). She also reported that while she felt she could lift more at home, household chores caused the pain to flare. (*Id.*). She was found to be able to lift a case of soda with both hands but not a case of bottled water, could not carry laundry up or down the stairs and was still waking two to three times a night with pain. (*Id.*). Her range of motion in her

neck had increased and she was able to move her head better when driving so long as her headaches were not bothering her. (*Id.*).

Hewitt followed up with Dr. Dardas on October 25, 2011, reiterating her complaint that therapy helped temporarily but that her pain would return. (Tr. 550). She reported feeling tired from her medications. (*Id.*). Her exam revealed no abnormalities, and the doctor managed her medications and referred her for an EMG for her cervical spine. (Tr. 550-51). He noted that she might be a surgical candidate, although that she was told she could have surgery only if she quit smoking for two weeks and so far has not been able to it. (Tr. 551). An EMG was normal, and Dr. Dardas recommended continuing physical therapy. (Tr. 556).

Hewitt completed a second round of physical therapy on November 22, 2011. (Tr. 678). Her pain level at discharge was 8/10, and was usually a 5/10. (*Id.*). She was noted to have been able to lift a 20 pound turkey in and out of the oven, but that her pain had increased the following day as a result. (Tr. 678). She was discharged noting no real change in range of motion or pain levels. (*Id.*). However, at a follow-up with Dr. Dardas on December 13, 2011, Hewitt reported that physical therapy at home was helping her manage her neck pain "quite nicely." (Tr. 670). She was "content at least for the moment to continue physical therapy in a self directed fashion." (*Id.*). She reported being unable to quit smoking. (*Id.*). An exam revealed no new findings, and Hewitt continued to have full motor strength, intact reflexes and sensation, and a normal station and gait. (*Id.*).

### iii.    *Mitral Valve Prolapse*

Hewitt's heart was found to be in regular rate and rhythm, with normal S1 and S2 sounds, and no S3 sound, at an exam on August 8, 2010. (Tr. 446). An August 9, 2010 EKG revealed mild-to-moderate mitral and tricuspid regurgitation. (Tr. 359-60). Upon hospital discharge on

August 11, 2010, Hewitt was instructed to increase activity as tolerated. (Tr. 315-19). When Hewitt was again in the emergency room for headaches on September 13, 2010, her heart was found to be normal, with regular rate and rhythm. (Tr. 448). An EKG supported this finding. (Tr. 449).

On January 4, 2011, Hewitt was admitted to the hospital for chest pain that she suffered during a physical therapy appointment where she was walking on a treadmill. (Tr. 387-442). She underwent a cardiac catheterization, which revealed severe mitral regurgitation. (*Id.*). She had a period of hypotension while in the hospital, but responded to treatment. (*Id.*). She was educated on the need to stop smoking and the need for possible mitral valve repair in the future. (Tr. 388). She was advised to increase activity as tolerated and discharged on January 8, 2011. (Tr. 387-88). She followed up with Dr. Joseph on January 14, 2011, complaining of fatigue, shortness of breath, numbness and tingling. (Tr. 496). He noted no murmurs in her heart, and renewed her medications. (*Id.*).

At emergency room visits in April, May and July 2011 for unrelated conditions, Hewitt's heart sounds were again considered normal. (Tr. 620; 634; 649; 652; 662; 665).

### iv.    *Chronic Obstructive Pulmonary Disease*

Hewitt's lungs were found to be clear on exam on August 8, 2010. (Tr. 350; 446). Her oxygen saturation was 100%. (Tr. 350). At an exam the following day, she reported no chest pain or shortness of breath, and her lungs were again without "significant wheeze or crackles." (Tr. 377). Nevertheless, she was diagnosed with chronic obstructive pulmonary disease ("COPD") at this time. (*Id.*). When Hewitt was again in the emergency room for headaches on September 13, 2010, her lungs were found to be clear. (Tr. 448). Her oxygen saturation was again 100%. (Tr. 449). A chest x-ray was negative. (Tr. 286; 454). A phone call to Dr. Vargas

14

on January 7, 2011, revealed that at her last appointment with him in December 2010 she had chronic rhonchi and wheezing. (Tr. 386). However, when admitted to the hospital in January 2011 for chest pains, she was found to have no significant wheezes or crackles, despite the fact that she reported having a chronic cough for the past three months. (Tr. 390; 392). A CT of her chest taken the same day revealed no active disease and clear lungs. (Tr. 399). At a follow-up with Dr. Joseph on January 14, 2011, Hewitt's lungs were found to be clear to auscultation, despite a complaint of shortness of breath. (Tr. 496).

Hewitt went to the emergency room on April 5, 2011, complaining of abdominal pain. A CT of her abdomen revealed "minimal subsegmental atelectasis of the lung bases", although a chest x-ray found no acute chest disease. (Tr. 629-31). Her breath sounds on exam were normal. (Tr. 620). During an emergency room visit for a headache in May 2011, Hewitt's blood oxygen level was 97% "indicating good oxygenation." (Tr. 649). It was 99% at an emergency room visit in July 2011. (Tr. 662). At other emergency room visits in April and May of that year, Hewitt's breath sounds were found to be clear and symmetrical. (Tr. 634; 643; 649; 652; 657; 662; 665)

### v.    Peripheral Vascular Disease

While in the hospital for a hemorrhagic stroke, Hewitt was diagnosed with peripheral vascular disease, after an exam revealed decreased peripheral pulses. (Tr. 377). However, when Hewitt was admitted to the hospital in January 2011 with chest pains, her peripheral pulses were palpable, and there was no significant edema, cyanosis or clubbing. (Tr. 390). At a follow-up with Dr. Joseph on January 14, 2011, Hewitt's pulses were found to be +2 throughout. (Tr. 496). At an emergency room visit on April 5, 2011, for an unrelated condition, Hewitt's pulses were full and equal, her skin was of normal color and there was no pedal edema. (Tr. 620). At an

15

emergency room visit in July 2011 for a headache, Hewitt's pulse was again found to be normal. (Tr. 657).

### vi.    Mental Impairments

At the emergency room on August 8, 2010, Hewitt reported a history of panic attacks and that she was currently on Xanax.  (Tr. 446).  She began treating at Bay Psychological Associates on April 28, 2011.  (Tr. 514-17).  She was originally diagnosed by the therapist with a mood disorder and anxiety, with a Global Assessment of Functioning ("GAF") score of 45, and a note that her highest GAF score in the last year was a 51.[2]  (Tr. 517).  However, after an initial psychiatric evaluation on May 16, 2011, Hewitt was issued a GAF score of 60.  (Tr. 511).  It also appears that her original diagnoses were changed on May 23, 2011 "per Dr. Rashid" to a panic disorder.  (Tr. 517).  She was placed on Celexa, and for a time on Ambien to help her sleep, although she stopped taking it because she did not like it.  (Tr. 508-510; 521-27).  Hewitt continued to report depression through August 2011, when her Celexa dosage was increased. (Tr. 508; 520).  She continued to report mood difficulties, mostly related to her physical limitations and her financial situation, through October 2011.  (Tr. 506; 518-20).  In November 2011, she reported only mild depression and that Celexa helped her greatly.  (Tr. 616).  Hewitt continued to report feeling a little less anxious in January 2012.  (Tr. 686).  At the end of that month, Dr. Rashid conducted a medication review and switched Hewitt from Xanax to Seroquel. (Tr. 690).  He noted that she had increased anxiety, irritability and depression due to financial

---

[2] "The GAF scale is a method of considering psychological, social, and occupational function on a hypothetical continuum of mental health. The GAF scale ranges from 0 to 100, with serious impairment in functioning at a score of 50 or below. Scores between 51 and 60 represent moderate symptoms or a moderate difficulty in social, occupational, or school functioning, whereas scores between 41 and 50 represent serious symptoms or serious impairment in these areas." *Norris v. Comm'r of Soc. Sec.*, No. 11-5424, 461 Fed. Appx. 433, 436 n.1 (6th Cir. 2012) (citations omitted).

concerns and physical pain.  (*Id.*).  He found her concentration and memory to be impaired and issued her a GAF score of 45-50.  (Tr. 690-91).

Hewitt continued to report depression, anxiety and a desire to isolate herself at therapy appointments in February and March 2012.  (Tr. 687-88).  She reported not liking Seroquel because she could not wake up.  (Tr. 687).  She also reported feeling like her memory was getting worse, and that she had a few bad panic attacks recently.  (Tr. 688).  She also reported difficulty with her activities of daily living.  (Tr. 687).  At a March 12, 2012 medication review, Hewitt reported not doing well and wanting "to explode."  (Tr. 692).  She again noted her financial difficulties and poor sleep.  (*Id.*).  An exam found her with a flat affect, poorly groomed and anxious and she was issued a GAF score of 50.  (*Id.*).  She reported stopping Seroquel on her own and going back to Xanax.  (*Id.*).  Dr. Rashid put her back on Seroquel.  (*Id.*).  Hewitt continued to report depression and panic attacks at therapy appointments in April 2012.  (Tr. 688-89).

Dr. Rashid and the therapist submitted a mental function questionnaire in support of Hewitt's disability application on March 12 and March 20, 2012 respectively.  (Tr. 680-85).  They issued her a GAF score of 49, with 49 being the highest score in the past year.  (Tr. 680).  They noted Hewitt's symptoms as poor memory, appetite disturbance, sleep disturbance, personality change, mood disturbance, emotional stability, recurrent panic attacks, pervasive loss of interests, feelings of guilt/worthlessness, difficulty thinking or concentration, suicidal thoughts, social withdrawal or isolation, decreased energy, persistent irrational fears, generalized persistent anxiety and hostility or irritability.  (*Id.*).  They noted that a mental status exam conducted that day revealed concentration and short term memory deficits and concluded that Hewitt was unable to focus.  (Tr. 681).  They noted some response to treatment, but found that

17

Hewitt would have difficulty working at a regular job on a sustained basis due to "too much pain." (Tr. 681-82). They issued her marked restrictions in activities of daily living, difficulties in maintaining social functioning and deficiencies of concentration, persistence and pace. (Tr. 683). They further found that her ability to understand, remember, and carry out detailed instructions was moderately limited, but her ability to understand, remember and carry out one or two-step instructions was not significantly limited. (Tr. 684). Her ability to maintain concentration for extended periods was also moderately limited. (*Id.*). Her ability to interact appropriately with the general public, ask simple questions, request assistance, respond appropriately to supervisors and get along with co-workers without distracting them was markedly limited, as was her ability to respond appropriately to work place changes, travel to unfamiliar places, use public transportation and set realistic goals. (Tr. 685). Her ability to maintain socially appropriate behavior was moderately limited. (*Id.*).

> b.      *Consultative and Non-Examining Sources*

Hewitt underwent a psychological consultation on February 10, 2011, with Dr. Michael Brady. (Tr. 501-504). She reported struggling with depression since August 2010 due to her physical impairments. (Tr. 501). Upon exam, Hewitt's mood was depressed, her mannerisms were cooperative, and she was noted to have been able to find the location of the consultation, driving alone, without difficulty. (Tr. 502). She had no difficulty with speech or thoughts. (Tr. 503). Dr. Brady noted "no abnormalities in mental capacity," and that her struggles with depression were due to her physical limitations. (Tr. 504). After reviewing treatment notes, Dr. Brady diagnosed Hewitt with adjustment disorder with depressed mood and issued her a GAF score of 65. (*Id.*). He opined that her "ability to relate and interact with others, includ[ing] coworkers and supervisors, is fair. Her ability to understand, recall, and complete tasks and

18

expectations does not appear to be significantly impaired.  Her ability to maintain concentration is fair.  She appears able to deal with normal workplace stressors appropriately or adaptively." (Tr. 504).

On March 3, 2011, Dr. Natalie Gray reviewed Hewitt's records to date as a consultative physician for the Commissioner.  (Tr. 69-96).  She opined that Hewitt was capable of lifting 20 pounds occasionally, 10 pounds frequently, sitting for up to six hours of an eight-hour work day and standing or walking the same amount of time, and unlimited pushing and pulling.  (Tr. 78). She found Hewitt could frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl but could never climb ropes, ladders or scaffolds.  (Tr. 79).  She further found that Hewitt must avoid concentrated exposure to noise, fumes, dust, odors, gases, and poor ventilation.  (*Id.*).

### c.    *Evidence Received After the Date of the ALJ's Decision*

On October 3, 2013, Hewitt's counsel submitted to this Court a request to extend the time to file her motion for summary judgment.  [10].  Attached to that motion was Hewitt's death certificate, stating that she died on August 16, 2013, as a result of acute pancreatitis, acute respiratory distress syndrome and metabolic acidosis, the onset of these conditions occurring at most 48 hours prior to death.  [10 at 3].  It was noted that Hewitt's tobacco use did not contribute to her death.  *Id.*

### D.    The ALJ's Findings

Following the five-step sequential analysis, the ALJ found Hewitt not disabled.  At Step One she found that Hewitt had not engaged in substantial gainful activity since her alleged onset date.  (Tr. 14).  At Step Two, she found the following severe impairments: degenerative disc disease of the lumbar and cervical spine with chronic neck and back pain, and cervical radiculopathy, mitral valve prolapse with mitral regurgitation, migraines, chronic obstructive

pulmonary disease and peripheral vascular disease.  (Tr. 14-15).  Although it appears from the body of the ALJ's Step Two analysis that she found Hewitt had a severe impairment of adjustment disorder and depression, she did not list these as severe impairment at Step Two.  (Tr. 15-16).  She found Hewitt's alleged sleep apnea was not a severe impairment.  (Tr. 16).

At Step Three, the ALJ concluded that none of Hewitt's severe impairments, either alone or in combination, met or medically equaled a listed impairment, specifically comparing her conditions to Listings 1.04 (Disorders of the Spine), 3.02 (Chronic Pulmonary Insufficiency), 4.02 (Chronic Heart Failure), the various subsections of Listing 11.00 (Neurological), and Listings 12.04 and Listing 12.06 (Affective Disorders and Anxiety-Related Disorders).  (Tr. 16-17).  In making this last determination, the ALJ determined that Hewitt only had mild limitations in activities of daily living, moderate difficulties in maintaining social functioning and moderate difficulties in concentration, persistence and pace.  (Tr. 17-18).

Next, the ALJ assessed Hewitt's RFC, finding her capable of light work, with sitting a total of six hours in an eight-hour day and standing or waking for the same amount, but that she needed a sit/stand opinion allowing her to change positions every 30-45 minutes.  (Tr. 18-19).  She also could occasionally climb ramps and stairs, but never ladders, ropes or scaffolds.  (Tr. 19).  She could frequently balance, stoop, kneel, crouch and crawl.  (*Id.*).  She must avoid concentrated exposure to noise, fumes, odors, dusts, gasses and poor ventilation.  (*Id.*).  She could understand, remember, and carry out simple instructions and perform simple tasks, and could have no more than occasional interaction with the public and coworkers.  (*Id.*).  In making this determination, the ALJ gave considerable weight to Dr. Vargas's opinion that Hewitt should avoid heavy lifting.  (Tr. 22).  She also gave considerable weight to consultative physician Dr. Gray's opinion on Hewitt's physical limitations.  (*Id.*).  She gave little weight to the opinion of

treating Dr. Sriharan, finding that it relied heavily on Hewitt's subjective reports and was inconsistent with the doctor's own treatment notes. (Tr. 23). She also gave little weight the opinion of Dr. Rashid and therapist Roethke, again finding that they relied too heavily on Hewitt's subjective reports and that the opinion was inconsistent with their treatment notes. (*Id.*). The ALJ gave considerable weight to the opinion of Dr. Brady, finding his opinion consistent with the medical evidence of record and well supported by clinical findings. (*Id.*).

At Step Four, based on the foregoing RFC assessment, the ALJ concluded that Hewitt could not return to her past relevant work. (Tr. 24). At Step Five, the ALJ determined that, based on Hewitt's age, education, vocational background and RFC, as well as VE testimony, that there were a significant number of jobs in the national economy that she could still perform, including the jobs of packer (1,800 jobs in the regional economy), inspector (1,800 jobs) and general clerical aide (4,000 jobs). (Tr. 25). Thus she was not disabled under the Act. (*Id.*).

### E.     Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a

preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.    Analysis

Hewitt argues that the ALJ failed to properly consider the treating physicians' opinion

22

evidence, resulting in the formation of an improper RFC and hypothetical question.  She also argues that a proper evaluation of the mental health opinion evidence would result in a finding that Hewitt meets Listing 12.04 (Affective Disorders).  For the reasons discussed below, the Court rejects both arguments.[3]

### 1.   Treating Physician Opinions

Hewitt first argues that the ALJ erred in giving little weight to the opinions of Drs. Sriharan and Rashid.  Hewitt's argument however, does not focus much on those opinions, but instead focuses more on the underlying medical records themselves, apparently arguing that those records show that Hewitt was more limited than the RFC assessment.  She then goes on to cursorily note the opinions of Drs. Sriharan and Rashid, and argues that these opinions are contrary to the RFC finding, but does not specifically argue why these opinions should be entitled to more weight.  Regardless, the Court finds that the ALJ properly evaluated all of the medical evidence and gave good reasons for the weight she assigned to each medical opinion of record.

---

[3] Hewitt also makes a passing reference to a claim that one of her diagnosed causes of death – acute respiratory distress syndrome – might have been connected to her diagnosis of COPD.  To the extent this argument is even sufficiently developed, and the Court finds that it is not, *see Martinez v. Comm'r of Soc. Sec.* No. 09-13700, 2011 U.S. Dist. LEXIS 34436 at *7 (E.D. Mich. Mar. 2, 2011) *adopted by* 2011 U.S. Dist. LEXIS 34421 (E.D. Mich. Mar. 30, 2011) (noting that "[a] court is under no obligation to scour the record for errors not identified by a claimant" and "arguments not raised and supported in more than a perfunctory manner may be deemed waived") (citations omitted), it still lacks merit.  Hewitt's death certificate is not evidence that this Court can consider on appeal, as it was not available to the ALJ.  *Elliott v. Apfel*, 28 F. App'x 420, 423 (6th Cir. 2002) (citing *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996) ("If the Appeals Council declines to review an ALJ's decision, federal courts cannot consider evidence not presented to the ALJ."); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993)).  Moreover, the certificate itself notes that the onset of the acute respiratory distress syndrome was 24 hours before death.  [10 at 3].  A cursory review of medical literature further makes clear that this syndrome is commonly associated with acute pancreatitis, which Hewitt suffered from at the time of her death.  *See e.g. Zhou, M.T., et al.*, Acute Lung Injury and ARDS in Acute Pancreatitis; Mechanisms and Potential Intervention, World Journal of Gastroenterology, 2010 May 7;16(17); 2094-9.

An ALJ must give a treating physician's opinion controlling weight where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) *quoting* 20 C.F.R. § 404.1527(d)(2).  If an ALJ declines to give a treating physician's opinion controlling weight, she must then determine how much weight to give the opinion, "by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) *citing Wilson*, 378 F.3d at 544; *see also* 20 C.F.R. § 404.1527(d)(2).  The ALJ must give good reasons, supported by substantial evidence in the record, for the ultimate weight given to a treating source opinion. *Id.*, *citing Soc. Sec. Rul*. 96-2p, 1996 SSR LEXIS 9 at *12, 1996 WL 374188 at *5.  An ALJ is not required to give any special weight to a treating source's conclusion that a claimant is disabled, as this conclusion is reserved to the Commissioner alone, based on all the evidence of record.  20 C.F. R. § 404.1527(e)(1), (e)(3).

Here, the ALJ gave little weight to the disability certificates of Dr. Sriharan, issued in September 2010, which limited Hewitt to lifting no more than ten pounds, no repetitive pulling, pulling, bending or twisting, and finding that she was disabled for a specific period of time.  (Tr. 23; 489-90; 525; 564).  The ALJ noted that these limitations were issued based in large part on Hewitt's own subjective reports of symptoms and limitations and appeared to be inconsistent with his own progress and treatment notes, as well as other evidence of record.  (Tr. 23).  These are valid reasons to give little weight to Dr. Sriharan's opinion, and they are supported by substantial evidence of record.  For instance, a phone call to Dr. Vargas, who treated Hewitt's

back and neck problems after Dr. Sriharan, resulted in an opinion that she should "probably avoid heavy lifting because of her back." (Tr. 386). This opinion varies considerably from the earlier and extremely limited opinion of Dr. Sriharan, which does not appear to have been based on any objective medical findings other than the MRIs, since there is no indication Dr. Sriharan ever conducted any motor, strength, reflex, sensory or other types of testing. (Tr. 345; 347; 345; 563-64; 603). The ALJ also noted that all objective testing of Hewitt's back and neck resulted in negative findings, including that she maintained full motor strength, with good reflexes and intact sensations in all extremities, that she had a normal station and gait, a full range of motion in her neck and back and a negative EMG. (Tr. 350; 375; 446; 448; 535-36; 550-51; 613; 620; 670). The ALJ also noted that while Hewitt was originally recommended for surgery, her inability to quit smoking prevented it, and her failure to abide by her doctor's recommendations to quit was evidence that perhaps her pain was not as bad as she alleged. (Tr. 536; 670). Further, later doctors, including Dr. Dardas, opined that Hewitt's cervical herniation was not a surgical problem, and Hewitt herself reported good results with at-home physical therapy. (Tr. 670). She had also reported previously good results with epidural injections. (Tr. 613). These are all good reasons, cited by the ALJ, for giving little weight to Dr. Sriharan's disability certificate and restrictions, and the Court sees no error in the weight the ALJ gave this opinion.

With regard to Dr. Rashid's March 2012 opinion that Hewitt suffered marked restrictions in all functional areas and could not work due to "too much pain," the ALJ noted that neither Dr. Rashid nor the therapist had treated Hewitt since November of the prior year, that his opinion appeared to be based in large part on subjective reports, and that he failed to specify particular work restrictions that she would have due to her mental impairment. (Tr. 23). Finally, the ALJ concluded that Dr. Rashid's opinion is inconsistent with his own treatment notes. (*Id.*). Thus,

25

she gave the opinion little weight.  (*Id.*).

The Court agrees that some of the reasons the ALJ cited for giving Dr. Rashid's opinion little weight are not valid.  For example, despite her finding that he had not treated Hewitt since November of the prior year, the record evidence shows he conducted a medication review of her in January 2012 and on the day he rendered his opinion.  (Tr. 690-92).  Second, the ALJ is incorrect that his opinion appears to be based in large part on subjective reports, as he cites having conducted a mental status examination at both of these latest appointments, and that Hewitt's concentration and memory were found to be impaired as a result.  (Tr. 691-92).

However, the Court does agree that Dr. Rashid's opinion is not only inconsistent with his prior treatment findings, but is also internally inconsistent.  While Dr. Rashid states that Hewitt's highest GAF score in the past year was 49, his treatment notes reveal that he had that very day issued her a GAF score of 50.  (Tr. 692).  He had also issued her a GAF score of 60 in April 2011.  (Tr. 510).  Second, while finding that Hewitt suffered from marked limitations in all functional areas, (Tr. 683), when asked specifically about her ability to function within those areas, Dr. Rashid found marked limitations in areas of social functioning and adaption, but only found at most moderate limitations in various areas of concentration, persistence and pace.  (Tr. 694-85).  He further stated that he could not comment on several functional areas that related to Hewitt's ability to sustain concentration, work in proximity with others, maintain a schedule, make work-related decisions and complete a work day or work week without interruption from psychological symptoms.  (Tr. 684).

Furthermore, Dr. Rashid's opinion that Hewitt's inability to work is due to "too much pain," renders his opinion less than helpful, because it is impossible to distinguish which limitations he believes are based on her mental impairments and which are based solely on her

26

physical ones, an area outside his scope of practice.  Hewitt's treatment noted consistently revealed that the biggest contributor to her anxiety and depression was her financial condition, and to a lesser extent her physical limitations and pain.  (Tr. 506; 518-20; 690; 692).  Finally, other evidence of record, including the consultative report of Dr. Brady (which was based on his in-person examination of Hewitt), contradicts Dr. Rashid's findings of marked limitations, as Dr. Brady opined that Hewitt's ability to get along with others was fair, as was her concentration, her ability to understand, recall and complete tasks was not significantly impaired, and she could deal with workplace changes "appropriately and adaptively."  (Tr. 504).  Dr. Brady based these findings largely on the fact that Hewitt was able to locate and drive to her appointment alone without difficulty, and had no difficulty with speech or thoughts during the examination.  (Tr. 502-03).  Therefore, the ALJ's reasons for giving Dr. Rashid's opinion little weight are generally valid and supported by substantial evidence of record.

### 2.   *Listing 12.04*

Hewitt argues that had the ALJ properly evaluated the medical opinion evidence, she would have found that Hewitt met or medically equaled Listing 12.04 (Affective Disorders).  However, for the reasons noted above, the ALJ gave good reasons, supported by substantial evidence of record, why she did not give more than little weight to Dr. Rashid's opinion, and those reasons are supported by substantial evidence.  As a result of that finding, the Court concludes that the ALJ did not err in her Step Three analysis, which found that Hewitt suffered from no more than mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence and pace.  (Tr. 17-18).

### 3.    *Adequacy of RFC and Hypothetical*

Hewitt also argues that the ALJ erred in her RFC assessment and in the hypothetical that she posed to the VE, in part based on the argument about the medical opinion evidence (which was discussed above), and in part because she believes the ALJ did not properly account for her moderate difficulties in concentration, persistence and pace. The ALJ's RFC concludes that Hewitt could "understand, remember, and carry out simple instructions and perform simple tasks." (Tr. 19). Hewitt argues that this is insufficient because it is not couched in terms of a limitation and thus simply stating what Hewitt can do does not place a restriction on what she cannot do. The Commissioner disagrees, as does this Court. The purpose of the RFC assessment is to determine "the most [a claimant] can do" despite her limitations. 20 C.F.R. § 404.1545(a)(1). Thus, regardless of how the RFC is worded, it is clear from the context that the ALJ was limiting Hewitt to no more than simple instructions and simple tasks.

Hewitt argues that even this is not enough to account for her moderate limitation in concentration, persistence and pace. She argues that, as a result of findings of deficiencies in these areas, the hypothetical needed to include restrictions on quotas, pace and speed. However, Dr. Brady found no deficiencies in these areas, and did not render any specific opinions as to Hewitt's ability to maintain quotas or pace. (Tr. 504). Nor does Dr. Rashid's medical opinion specifically discuss keeping pace or managing quotas as part of his opinion on Hewitt's ability to concentrate. (Tr. 684). To the extent his finding of a moderate limitation in Hewitt's ability to maintain attention and concentration for extended periods can translate to such a limitation, the ALJ found this opinion entitled to little weight, a finding supported by substantial evidence of record, as noted above.

For these reasons, the Court finds that the ALJ's RFC assessment, and her corresponding

hypothetical to the VE accurately portray Hewitt's credible limitations and are supported by substantial evidence of record.  *See McMurray v. Colvin*, No. 13-10496, 2014 U.S. Dist. LEXIS 34549, *49-51 (E.D. Mich. 2014) *adopted by* 2013 U.S. Dist. LEXIS 32544 (E.D. Mich. Mar. 13, 2014) (finding no error in ALJ's limitation to simple, routine tasks where there was no indication in the record of a specific need for a restriction on task, pace or quotas).  Therefore, the Court finds that the ALJ did not err in concluding that Hewitt was not disabled.

## III.   CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that Hewitt's Motion for Summary Judgment **[11]** be **DENIED** the Commissioner's Motion **[17]** be **GRANTED** and this case be **AFFIRMED**.

Dated: August 12, 2014                    s/David R. Grand_____
Ann Arbor, Michigan                       DAVID R. GRAND
                                          United States Magistrate Judge

## <u>NOTICE TO THE PARTIES REGARDING OBJECTIONS</u>

Either party to this action may object to and seek review of this Report and Recommendation, but must act within fourteen days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal.   *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991)*; United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  A copy of any objection must be served upon this Magistrate Judge. E.D. Mich. LR 72.1(d)(2).

Each **objection must be labeled** as "Objection #1," "Objection #2," etc., and **must specify** precisely the provision of this Report and Recommendation to which it pertains.  Not later than fourteen days after service of objections, **the non-objecting party must file a response** to the objections, specifically addressing each issue raised in the objections in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.  The response must be **concise and proportionate in length and complexity to the objections**, but there is otherwise no page limitation.

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 12, 2014.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager